**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                        **Criminal Case No.: 1:22-CR-59
(JUDGE KLEEH)**

**JACK F. GIBBINS, III,**

        **Defendant.**

**REPORT AND RECOMMENDATION RECOMMENDING THAT
DEFENDANT'S MOTION TO SUPPRESS, ECF NO. 32, BE DENIED**

Presently pending before the undersigned Magistrate Judge is Defendant Jack F. Gibbins, III's Motion to Suppress Physical Evidence, ECF No. 32, filed on January 13, 2023. By Order entered on January 17, 2023, ECF No. 33, United States District Judge Thomas S. Kleeh referred the motion to the undersigned to enter a report and recommendation as to disposition of the motion.

The undersigned also is in receipt of the Government's Response to the Defendant's Motion to Suppress Evidence, filed on January 23, 2023, ECF No. 39, as well as the parties supplemental briefings, ECF Nos. 46, 48. The undersigned conducted a hearing on Defendant's motion on February 7, 2023, at which the Court heard witness testimony and accepted exhibits into evidence, and on February 10, 2023, at which the Court heard oral arguments from counsel.

Based on a detailed review of Defendant's motion, ECF No. 32, the Government's response, ECF No. 39, the supplemental briefings, ECF Nos. 46, 48, the evidence, oral arguments, and testimony introduced, the undersigned **RECOMMENDS** that Defendant's motion, ECF No. 32, be **DENIED** as set forth herein.

# I. FACTUAL BACKGROUND

Defendant Jack F. Gibbins, III, ("Defendant") stands accused in a one-count Indictment which a Grand Jury returned against him on September 7, 2022. ECF No. 1.  Defendant is charged in the sole count with the offense of Possession with Intent to Distribute 5 Grams or More of Methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(viii). Both the Indictment and the subject Motion to Suppress arise from an attempted traffic stop, police pursuit, and resulting hospital visit that occurred on July 13, 2021.

On July 13, 2021, Officer Cameron Turner of the Bridgeport Police Department was nearing the end of his afternoon shift and driving home when he observed a motorcycle run the red light located at the bottom of the exit ramp off Mile Marker 121 of I-79 North. Officer Turner initiated his emergency lights to conduct a traffic stop based upon the observed traffic violation. The motorcycle continued to drive away. Officer Turner initiated his siren, and the motorcycle increased its speed, seemingly in an attempt to flee.

Officer Turner called the pursuit into Harrison County 9-1-1, and Officer Turner continued to follow the motorcycle in and around the Meadowbrook Road area onto I-79 Southbound then off the Anmoore exit. Harrison County law enforcement officers joined the pursuit as Officer Turner and the motorcycle exited the Anmoore exit, then proceeded onto Route 58. Thereafter, Harrison County law enforcement officers took lead in the pursuit.

Eventually, the driver of the motorcycle (later identified as Defendant Jack F. Gibbins, III) laid down or wrecked his motorcycle in a local street, sustaining numerous injuries, including, but not limited to, a broken leg, a deep laceration on his arm, two broken ribs, fractured C2 vertebra, and a shoulder separation. Gibbins then attempted to "flee" or "get out of the road" on foot.

More law enforcement officers arrived on scene; a canine was deployed and officers, including the K9 officer, pursued the in-flight, but injured Gibbins. Gibbins was eventually

detained and placed in handcuffs. Officers called for emergency medical services ("EMS") based on Gibbins' apparent injuries. A search of Gibbins' pockets was performed while he was lying on the ground awaiting the arrival EMS. His possessions were placed into a brown paper bag, along with his motorcycle helmet, and transported with him in the ambulance. Gibbins was transported to the Emergency Department at United Hospital Center ("UHC") in Bridgeport, West Virginia. Officer Turner drove separately in his police cruiser to the hospital.

Upon arriving at the hospital, Officer Turner was quickly relieved by Officer Issac Thomas of the Bridgeport Police Department who would soon be beginning his "midnight" work shift. Officer Turner returned to the Bridgeport Police Department to begin drafting his incident report, while Officer Issac Thomas spoke to hospital staff to get a update on Gibbins' status. Officer Issac Thomas recalls asking one of the nurses, though he did not recall their name, if they could smell alcohol or drugs on Gibbins. The nurse responded that she didn't smell any alcohol and all tests indicated he did not have anything in his system. The nurse went on to tell Officer Thomas that they had "recovered" or "saw" that there were "drugs" or controlled substances in Defendant Gibbins' pants.

Officer Thomas then went into the trauma room where Gibbins receiving treatment, and, on a counter to his left, Officer Thomas saw all the suspect's belongings, including a pair of brown jeans. Officer Thomas went over to the jeans, went inside the pocket of Gibbins' jeans, and pulled out the drugs.

Officer Thomas notified Officer Turner, the arresting officer of the discovered drugs. Once Gibbins was medically cleared, Officer Thomas transported him to Bridgeport Police Department. Officer Thomas gave the drugs to Officer Turner to process and put into evidence at the Bridgeport

Police Department. Officer Thomas searched Gibbins and then transported Gibbins from the station to North Central Regional Jail for intake.

There is a significant factual dispute among the parties regarding the clothing worn by Gibbins at the time of his release from UHC. The Government suggests he was wearing the same brown pants, or jeans, that he was wearing at the time of his arrest – Officer Thomas could not recall what Gibbins was wearing upon release, and CCO Hutson testified that, based upon how hospital clothing is generally handled at intake by NCRJ, he reads the Inmate Personal Property Sheet completed for Jack F. Gibbins, III upon intake on July 13, 2021 to mean he was wearing his personal pants and not hospital garb upon admission. Defendant Jack F. Gibbins testified he never saw his July 13, 2021 personal outwear again after it was removed by hospital staff and maintains that he was released from UHC in a pair of stock blue hospital scrub pants, cut to accommodate his splint.

## II. PROCEDURAL BACKGROUND

On January 13, 2023, Defendant Jack F. Gibbins, III, by counsel, filed a Motion to Suppress Physical Evidence, wherein, he argues, *inter alia*, that the warrantless search and seizure of his pants at the hospital was in violation of his Fourth Amendment rights. ECF No. 32 at 4. Gibbins specifically argues, relying upon precedent from the United States Court of Appeals for the Fifth Circuit, *United States v. Neely*, 345 F. 3d 366, 369 (5th Cir. 2003), and other miscellaneous courts, *United States v. Davis*, 657 F. Supp.2d 630, 637 (D. Md. 2009), and *Jones v. State*, 648 So.2d 669 (Fla. 1994), that hospital patients have a reasonable expectation of privacy in their personal clothing, and police may not seize those clothes without a warrant. ECF No. 32 at 4-6.

In Response, filed with leave[1] from the Court on January 23, 2023, the Government initially argued that the Fourth Amendment does not apply to the search where a nurse, Registered Nurse JoCee Tucker, performed the search of Gibbins' pants. ECF No. 39 at 4. The Government asserted that numerous "courts have declined to exclude evidence in criminal cases when obtained by private citizens." *Id*. (quoting *United States v. Winbush*, 428 F.2d 357, 359 (6th Cir. 1970)). The Government additionally argues that law enforcement would have inevitably discovered the drugs in Gibbins' pants, regardless of any searches performed at the hospital. ECF No. 39 at 4-7. The Government asserts that both the Bridgeport Police Department ("BPD") and West Virginia Division of Corrections and Rehabilitation ("WVDOCR") have written search policies, supporting the notion that the search and discovery of the controlled substances was inevitable, regardless of any actions by Officer Thomas or RN Tucker. The Government further asserts that these inventory searches by BPD and WVDOCR are incidental administrative steps which may constitute a legitimate, inevitable search and allow for the admission of evidence which might otherwise be excluded. ECF No. 39 at 6 (citing *United States v. Banks*, 482 F.3d 733, 739 (4th Cir. 2007)).

On February 6, 2023, Defendant Gibbins, by counsel, electronically filed an Exhibit on CM/ECF, ECF No. 41, an Inmate Personal Property Sheet for Jack F. Gibbins, which was later submitted and admitted into evidence as Government's Exhibit D, ECF No. 44-4.

On February 7, 2023, a suppression hearing was held, at which time the Court hearing sworn testimony and received numerous exhibits into evidence. Due to time constraints, the suppression hearing was continued to February 10, 2023, and the parties were directed to file supplemental briefings prior to the resumed hearing as to whether there is a reasonable expectation

---

[1] On January 20, 2023, the Government made an unopposed motion for an extension of time to file a response to Defendant's Motion, ECF No. 36, which was granted by Order entered the same day, ECF No. 38.

of privacy when an individual has been arrested but is receiving emergency medical treatment in a hospital setting. ECF No. 42.

On February 9, 2023, the Government, filed its supplemental brief, citing to two cases from the United States Court of Appeals for the Ninth Circuit, *United States v. Chukwubike*, 956 F.2d 209 (9th Cir. 1992), and *United States v. George*, 987 F.2d 1428 (9th Cir. 1993). The Government argues in the supplemental brief that Defendant Gibbins did not have a reasonable expectation to privacy because he was admitted to the hospital under police supervision following his arrest. ECF No. 46. The Government, again, requested that the Court deny Gibbins' motion to suppress physical evidence. *Id*. at 2. The Government also filed a Notice of Supplemental Rebuttal Evidence, outlining the exhibits to be introduced at the February 10, 2023 suppression hearing continuation. ECF No. 47.

On February 10, 2023, Defendant Gibbins, by counsel, filed a supplemental briefing, wherein Defendant Gibbins again argues that he did have a reasonable expectation to privacy in his belongings at the hospital. ECF No. 48 at 2-4. Gibbins argues the search by Officer Thomas does not constitute a search incident to arrest, an exception to the warrant requirement, because it was too far in time and geographic scope from the arrest. ECF No. 48 at 4-6. Lastly, Gibbins argues that the drugs would not have been inevitably discovered, and the pants would not have been inevitably searched, because the pants never did arrive there with Gibbins. ECF No. 48 at 7-8. Gibbins specifically argues that there is insufficient evidence that the policies and procedures of BPD or WVDOCR were ever followed with Gibbins, and, even if they were, it was not inevitable any drugs would have been found, because Gibbins testified that he did not wear the pants in question to either the Bridgeport Police Department or the regional jail. *Id*.

6

On February 10, 2023, the Court resumed the suppression hearing, by videoconference,[2] receiving more exhibits and hearing oral arguments from the parties.

## II. SUMMARY OF TESTIMONY AND OTHER EVIDENCE

During the aforementioned suppression hearing on February 7, 2023, the Court heard sworn testimony from the following witnesses: (1) JoCee Tucker, Registered Nurse at United Hospital Center; (2) John Backus, Director of Emergency Medicine Operations at United Hospital Center; (3) Bridgeport Police Department Officer Cameron Turner; (4) Bridgeport Police Department Officer Isaac Thomas; (4) Chief Correctional Officer at North Central Regional Jail Jason Hutson; (5) Supervisory Deputy U.S. Marshal Joseph McCarty; (6) Defendant Jack F. Gibbins, III; and (7) Special Agent Jared Newman of the Bureau of Alcohol Tobacco, Firearms, and Explosives.

The Court also received the following exhibits into evidence at the hearings on February 7, 2023 and February 10, 2023: (1) Government's Exhibit A – Bridgeport Police Department Law Enforcement Policies and Procedures, ECF Nos. 44-1, 39-1; (2) Government Exhibit B – Inmate Admission Procedures at Jails and Short-Term Holding Facilities, ECF Nos. 44-2; 39-2; (3) Government Exhibit C – July 13, 2021 WVDOCR Inmate Personal Property Inventory, ECF No. 44-3; (4) Government Exhibit D - July 23, 2021 WVDOCR Inmate Personal Property Inventory, ECF No. 44-4; (5) Government Exhibit E – July 23, 2021 Notification Email of Defendant's Arrest, ECF No. 44-5; (6) Defendant's Exhibit A - July 13, 2021 Scene-Stretcher Photograph of

---

[2] The undersigned scheduled the continuation of the suppression hearing by videoconference with the consent of the parties. At the conclusion of the February 7, 2023 proceedings, after consultation with counsel, Defendant Jack F. Gibbins, III, and his counsel, Elizabeth B. Gross, signed a videoconferencing waiver consenting to the February 10, 2023 proceedings being conducted by videoconference. ECF No. 45. On the record during the February 10, 2023 hearing, Defendant Jack F. Gibbins, III, and his counsel reaffirmed their consent to proceed by videoconference/teleconference technology.

Defendant, ECF No. 44-6; (7) Government Exhibit G – CD[3] with Police Dashcam Recording; (8) Government Exhibit F[4] – Audio clips[5] from NCRJ Interview; (9) Government's Exhibit H – Bridgeport Police Department Incident Report, ECF No. 44-7; (10) Government Exhibit I – CD containing Officer Harkins' Body Camera Recording; (11) Government Exhibit J – CD containing Officer K. Diaz's Body Camera Recording; (12) Government Exhibit K – CD containing Officer K. Moneypenny's Body Camera Recording; (13) Government Exhibit L – CD containing Officer Criss' Body Camera Recording; (14) Government Exhibit M – CD containing Officer Moore's Body Camera Recording; and (15) Government Exhibit N – CD containing Officer T. Cox's Body Camera Recording.

### (1) Testimony of JoCee Tucker

Defendant's counsel first[6] called JoCee Tucker to testify. According to her testimony, JoCee Tucker ("RN Tucker") works as a Registered Nurse at United Hospital Center in Bridgeport, West Virginia, though she is presently on family medical leave. ECF No. 49 at 11-13.

RN Tucker testified that, on the date of July 13, 2021, she was working in her capacity as a nurse on dayshift in the emergency department. ECF No. 49 at 13, ¶ 5-11. RN Tucker testified she vaguely recalled treating the Defendant, Jack F. Gibbins, III, while on her shift. *Id.* at ¶21-25. RN Tucker could not remember his specific injuries, but did recall that he was in a motorcycle accident after "running from the cops." ECF No. 49 at 14, ¶ 5-10; at 21, ¶ 18-21.

---

[3] Physical copies of the CD Exhibits referenced herein are lodged in the case file for this matter, 1:22-CR-59 in the Clerk's Office at the Clarksburg, West Virginia point of holding court.
[4] Defendant's counsel objected to the admission of these audio files on the grounds that they were not relevant to the subject Motion to Suppress. Counsel for the Government argued, in response, that the audio files were important for the purposes of assessing Defendant's credibility. The undersigned will address the admission of this evidence by entry of a concurrent Order.
[5] CDs with these audio files are likewise lodged in the case file for this matter, 1:22-CR-59 in the Clerk's Office at the Clarksburg, West Virginia point of holding court.
[6] With the agreement of the parties, in order to accommodate the schedules of RN Jocee Tucker and Director John Backus, these witnesses were called out of turn.

RN Tucker did not recall cutting off Defendant's pants, but explained that cutting off clothing to evaluate and treat injuries is a normal occurrence. ECF No. 49 at 14 ¶ 17-25; at 18, ¶ 17-25. RN Tucker testified that in a trauma room, there are beds, "lots of equipment like intubation, ventilators, CPAPs," and "IV carts." ECF No. 49 at 15, ¶ 1-7. RN Tucker testified that the trauma rooms are separate from the general areas, but, if patients, are brought into the emergency room in police custody, the officers are permitted to be inside the trauma room. ECF No. 49 at 22-23. RN Tucker testified the officers frequently sit in chairs outside the trauma room while hospital staff provide treatment. *Id.*

RN Tucker explained that if someone's clothing is cut off or removed, hospital staff try to keep all of the patient's belongings together, often by putting them in a belongings bag, so the patient may later decide if they want to throw those belongings away or wash them. *Id.* at ¶ 8-25.

RN Tucker remembered an officer being present with Defendant Gibbins, but did not recall the officer's name or her conversation with the officer. Further, RN Tucker did not recall whether she or the officer searched Defendant Gibbins' pants. ECF No. 49 at 16, ¶ 3-25; at 17, ¶ 22-25; at 18, ¶ 14-16. RN Tucker testified it is not uncommon for officers to ask hospital staff for updates on a patient in custody, particularly during or after a shift change. ECF No. 49 at 25.

RN Tucker explained that if someone is unresponsive or comes in as a John Doe, hospital staff search that person to find identification or to look for a "culprit" as to why the individual is unresponsive. ECF No. 49 at 18, ¶ 1-13. RN Tucker testified that, otherwise, it is not her normal practice to search patients' clothing. ECF No. 49 at 21, ¶ 9-11. RN Tucker testified that if she were to find drugs in a patient's clothing during a search, she would likely keep those drugs with the patient's belongings and inform officers of the presence of the drugs. ECF No. 49 at 19, ¶ 10-25]. RN Tucker testified that, on the date in question, however, the Defendant was not a John Doe, he

was responsive, and she does not believe there was a medical reason to search his clothes. ECF No. 49 at 20, ¶ 10-24.

### (2) Testimony of John Backus

The Government called John Backus ("Backus"), Director of Emergency Medicine Operations at United Hospital Center, to testify. ECF No. 49 at 27, ¶ 3-15. Backus testified that in his role as director, he is responsible for overall operations of the emergency department, including supervising all nurses and staff, including RN JoCee Tucker. ECF No. 49 at 27-28.  Backus further testified that he is responsible for being familiar with the policies and practice under which staff should operate. *Id*. Backus testified that, while there is no written policy, it is standard practice that if nurses find drugs in a patient's clothing, the nurse should provide the controlled substance to law enforcement officers. ECF No. 49 at 28-29. Backus testified this is the standard practice in every emergency department he's ever worked in, including another hospital in North Carolina and two different hospitals in Ohio. ECF No. 49 at 30, ¶ 10-13; at 31, ¶ 1-7. Backus testified HIPPA does not prevent the sharing of information about the discovery of drugs to officers because "it's not protected health information." ECF No. 49 at 30, ¶ 12-14. Backus testified, however, that nurses do not get training on what certain illicit drugs look like. ECF No. 49 at 30.

### (3) Testimony of Bridgeport Police Department Officer Cameron Turner

The Government next called Bridgeport Police Department Officer Cameron Turner ("Officer Turner") to testify. ECF No. 49 at 31, ¶ 16-20. Officer Turner is a general patrol officer who has been working with the Bridgeport Police Department for approximately four years. *Id*. at ¶ 20-23.

Officer Turner testified that on July 13, 2021, he had been working the afternoon shift, from four o'clock in the afternoon to midnight, and was driving home from work when he observed a motorcycle sitting at the red light located at the bottom of the Meadowbrook Road exit ramp off

of Interstate 79 North. ECF No. 49 at 33. Officer Turner testified that there was "no one else around," and the "motorcycle decided to run through a solid red light and make a left turn onto Meadowbrook Road." *Id*. Officer Turner explained that he immediately initiated his emergency lights to conduct a traffic stop on the motorcycle based upon the traffic violation. ECF No. 49 at 34, ¶ 1-7.

Officer Turner testified that after he initiated his cruiser's emergency lights, the motorcycle did not stop, but rather continued onto Barnetts Run Road, so Officer Turner initiated his siren. *Id*. at ¶ 8-12. Because the motorcycle next increased his rate of speed as to flee, Officer Turner called the pursuit into Harrison County 911. *Id*. at ¶ 13-16. Officer Turner testified that the pursuit continued, at approximately twenty (20) miles above the relative speed limits, from Barnetts Run Road, around various hotels, back onto Barnetts Run Road, left onto Meadowbrook Road, onto I-79 Southbound, off the Anmoore exit, then onto Route 58. ECF No. 49 at 34, ¶ 17-24. Officer Turner testified that Harrison County law enforcement officers joined the pursuit around the time that the motorcycle and Officer Turner's cruiser got off the Anmoore exit. ECF No. 49 at 35. Officer Turner testified that as the motorcycle got off the Anmoore exit, the motorcycle nearly struck a Harrison County cruiser, and the cruiser became the lead pursuer in the chase at that time. *Id*.

Officer Turner testified that eventually the motorcycle was laid down or wrecked, and the motorcycle driver tried to flee on foot. *Id*.; ECF No. 49 at 37, ¶ 5-22. Officer Turner testified that the Defendant was eventually detained, placed in handcuffs, and placed under arrest. ECF No. 49 at 35. Officer Turner explained that a quick search of Defendant Gibbins' body was done, including his pockets, to ensure there were no weapons on him, and all his possessions were placed into a brown paper bag, along with his motorcycle helmet. *Id*. at ¶ 10-22; ECF No. 49 at 38. Officer

Turner testified that because of Gibbins' injuries and the way he was cuffed, officers were unable to do a full search incident to arrest on the scene. ECF No. 49 at 36, ¶ 1-13; at 41-42. Officer Turner testified that he did not personally conduct the search, but he saw items being taken out of Gibbins' pockets and placed into a bag. ECF No. 49 at 38; at 42-43. Officer Turner testified he did not believe any photographs were taken on scene of Gibbins' items or possessions seized. ECF No. 49 at 38-39.

Officer Turner could not recall Defendant Gibbins' specific injuries, but remembered that he was injured, that EMS showed up on scene, evaluated Gibbins, then took Gibbins straight to United Hospital Center ("UHC"). ECF No. 49 at 35-36. Officer Turner could not recall what Gibbins was wearing when loaded into the ambulance, but he did recall that there was blood on Gibbins. ECF No. 49 at 39.

Officer Turner testified he followed behind the ambulance to UHC and briefly monitored Defendant Gibbins at UHC, but then went back to the office to start paperwork related to the pursuit and arrest. ECF No. 49 at 36; at 39. Officer Turner testified he was quickly relieved by Officer Thomas upon arriving at UHC. *Id*.

Officer Turner testified that he was present whenever Defendant Gibbins was medically cleared and appeared at the Bridgeport Police Department, but Officer Turner did not remember what Gibbins was wearing or what his injuries were at that time. ECF No. 49 at 40-41.

On recall, Officer Turner testified that after the incident on July 13, 2021 involving Defendant Gibbins, he, as well as other officers, prepared written reports as required by the Bridgeport Police Department. ECF No. 49 at 126; *see also* Government's Exhibit H, ECF No. 44-7.

Officer Turner further testified that on July 13, 2021, Gibbins was able to flee approximately thirty (30) to forty (40) yards from where his bike was laid down. ECF No. 49 at 128. He further testified that he was involved in the pursuit and arrest of Gibbins and a dog was deployed by a K9 officer to pursue Gibbins. ECF No. 49 at 128-129. Officer Turner testified that during the arrest, no officer or individual punched, kicked, abused, or assaulted Gibbins. ECF No. 49 at 129. Officer Turner testified that the immediate thoughts once Gibbins was detained were to arrest Gibbins and to get EMS to treat him. *Id*.

On cross-examination, Officer Turner conceded that there were no details in his report regarding the name of the officer who searched Gibbins or details regarding the K9 deployment. ECF No. 49 at 130-131; *see also* Government's Exhibit H, ECF No. 44-7.

### (4) Testimony of Bridgeport Police Department Officer Isaac Thomas

According to the testimony of Bridgeport Police Department Officer Isaac Thomas ("Officer Thomas"), Officer Thomas is a patrol officer for the Bridgeport Police Department and has been working with the department for approximately five years. ECF No. 49 at 44.

Officer Thomas testified that on July 13, 2021, he was going into work for the midnight shift and went to UHC to relieve Officer Turner. ECF No. 49 at 44; at 51. Officer Thomas testified that his obligations were to stay with Defendant Gibbins and wait until he was medically cleared to be transported back to the station. Officer Thomas testified that commonly, when relieving officers in these circumstances, he will check in with the officer he's relieving as well as the nurses to learn what the status is, if the individuals is going to be admitted, or how long until the possible release. ECF No. 49 at 46.

Officer Thomas testified he asked one of the nurses if they could smell alcohol or drugs on Gibbins and she responded that she didn't smell any alcohol on the Defendant. ECF No. 49 at 52-53. Officer Thomas testified a nurse told him they had "recovered" or "saw" that there were drugs

in Defendant Gibbins' pants. ECF No. 49 at 53. Officer Thomas testified that he next went into the trauma room where Gibbins was laying in the hospital bed, and, on a counter to Officer Thomas' left, he saw all the suspect's belongings, including a pair of brown pants. ECF No. 49 at 46; at 53-54. Officer Thomas testified he "went over and recovered the items that were in the pants" – specifically, Officer Thomas went into the pocket of Defendant Gibbins' pants and pulled out the drugs. ECF No. 49 at 46; ECF No. 49 at 53.

Officer Thomas testified that, generally, any drugs recovered at the hospital are taken to Bridgeport Police Department to be put into evidence. ECF No. 49 at 46, ¶ 16-25; at 47, ¶ 1-12]. However, he did explain that because Officer Turner was the arresting officer in this matter, Officer Thomas notified Turner of the situation, and gave the drugs to Officer Turner to put into evidence while he transported Gibbins to the regional jail. ECF No. 49 at 57; at 59.

Officer Thomas could not remember the extent of Defendant Gibbins' injuries upon release but did remember Gibbins had a large laceration on his leg. ECF No. 49 at 54. Officer Thomas testified that once Gibbins was released, he transported Gibbins to the Bridgeport Police Department. ECF No. 49 at 55.

Officer Thomas could not recall what clothing Gibbins was wearing when he was released from the hospital, *Id.*, nor could he recall what personal items were taken back to the Bridgeport Police Department. ECF No. 49 at 46, ¶ 16-25. Officer Thomas testified that he always tries to take whatever belongings an individual has with them to the regional jail, ECF No. 49 at 47, ¶ 1-6. Officer Thomas specifically could not remember if Mr. Gibbins pants were taken from the hospital and transported to Bridgeport Police Department and the regional jail or not. ECF No. 49 at 47, ¶ 7-12.

Officer Thomas further testified that Bridgeport Police Department has a policy, 3.2.2., that instructs officers to search arrestees before they are transported to the regional jail irrespective or any prior search. ECF No. 49 at 47-48; *see also* Government's Exhibit A, ECF No. 44-1. Officer Thomas testified that it is his "habit" that whenever he makes initial contact with an individual who is in custody, he will search them, particularly, if he is responsible for transporting them to a regional jail. ECF No. 49 at 49, ¶ 10-21. Officer Thomas believes he did a search on Mr. Gibbins, in addition to his search of the pants, for the purposes of transportation from the hospital to the regional jail. ECF No. 49 at 49, ¶ 22-23; ECF No. 49 at 56, ¶ 14-19.

Officer Thomas testified that he is familiar with the intake procedures of North Central Regional Jail and the searches performed on arrestees that are being processed into that facility. ECF No. 49 at 50. Officer Thomas explained that arrestees are placed into a holding cell where they are instructed to put personal items, such as tobacco products or knives, into a drop box, before undergoing a thorough search. Officer Thomas testified that next, all items found in their search and belongings provided to the jail by the arresting agency will be logged into North Central Regional Jail's system. *Id*. Officer Thomas testified that if any controlled substances are found during the intake process, they will be returned to the arresting law enforcement agency so they may take the contraband into evidence and pursue additional charges if desired. ECF No. 49 at 50-1.

### (5) Testimony of Jason Alan Hutson

The Government next called Jason Alan Hutson, Chief Correctional Officer at North Central Regional Jail ("CCO Hutson") to testify. CCO Hutson testified that he's been employed with the West Virginia Division of Corrections and Rehabilitation for over twenty (20) years. ECF No. 49 at 62-63. CCO Hutson testified that as head or chief correctional officer it is his responsibility to supervise uniformed staff to ensure they follow policies and procedures and work

towards the objectives of care, custody, and control at the facility. ECF No. 49 at 63, ¶ 1-15. CCO Hutson's responsibilities include overseeing the admission process and adherence to intake policies at North Central Regional Jail. ECF No. 49 at 63-65, *see also* Government's Exhibit B, ECF No. 44-2.

In his testimony, CCO Hutson explained that whenever a new intake is brought to the facility by local law enforcement, NCRJ staff performs a "thorough pat search" before the individual comes into any secured area of the facility. ECF No. 49 at 65, ¶ 21-25. CCO Hutson further testified any personal possessions of the individual are also searched to ensure there are no weapons, drugs, alcohol, cell phones, or other contraband. ECF No. 49 at 66; at 69. CCO Hutson explained correctional officers will create a personal property inventory for each person and the items they come into the jail with in order to ensure that, upon release, they leave with the same possessions. *Id*. CCO Hutson further explained a body scanner is used to search the individual in accordance with WVDOCR policies. ECF No. 49 at 67.

CCO Hutson testified that if any illicit items are found during a pat search, body scanner search, or personal property search during the intake process, the correctional officer should turn that evidence over to the arresting law enforcement agency as well as notify supervisors. ECF No. 49 at 70. CCO Hutson explained this process occurs because the individual is not technically in the custody of the WVDOCR until after the completion of the intake/admission process. *Id*.

However, CCO Hutson agreed, on cross-examination, that he does not know how often the policies and procedures regarding the completion of personal inventory sheets are followed. He testified, however, that the jail periodically undergoes an auditing process. ECF No. 49 at 83-84. CCO Hutson testified that the regional jail is overcrowded and understaffed, but explained "we still

have to do what we're supposed to do," and the intake process and searches during intake some of the most important rules governing inmates within the institution. ECF No. 49 at 84-85, at 87-88.

CCO Hutson testified that an Inmate Personal Property Inventory Sheet was completed for inmate Defendant Jack Gibbins, III, upon his intake on July 13, 2021, and appears to be signed by Defendant Jack Gibbins, III upon his later release on July 21, 2021. ECF No. 49 at 71-73, *see also* Government's Exhibit C, ECF No. 44-3. CCO Hutson noted that on July 13, 2021, there was no signature provided by Defendant Gibbins on the inventory sheet, only his alleged "scribble" upon his later release. ECF No. 49 at 80-81. CCO Hutson testified that the personal property included on the sheet was returned to Gibbins upon his release, including keys, a chain, a bracelet, four rings, a pair of pants (cut), a pair of shoes, a belt, a helmet, and crutches. ECF No. 49 at 73-75; at 80. CCO Hutson testified that any coins in his possession, below thirty dollars ($30), would be taken and put towards Defendant Gibbins' processing fee. ECF No. 49 at 74. CCO Hutson noted in his testimony that no shirt was listed on Gibbins' inventory sheet for July 13, 2021. ECF No. 49-2 at 86.

CCO Hutson testified that another Inmate Personal Property Inventory Sheet was completed for Defendant Jack Gibbins, III, but was completed without a date; however, CCO Hutson testified he was able to ascertain that this personal property inventory sheet was associated with Defendant Gibbins arrest and intake from July 23, 2021. ECF No. 49 at 76-77, *see also* Government's Exhibit D, ECF No. 44-5, Defendant's Exhibit, ECF No. 41. CCO Hutson testified that on this inventory sheet, Defendant Gibbins' signature was at the top, upon intake, but there was no signature upon release because it was his understanding that Gibbins was not released, but rather, transferred to another facility. ECF No. 49 at 81.

CCO Hutson testified that he was not personally there to watch when Gibbins was processed through intake on July 13, 2021. ECF No. 49 at 81-82. CCO Hutson further testified he

did not know who searched Defendant Gibbins. ECF No. 49 at 82. CCO Hutson testified that he was not sure if Defendant Gibbins qualified for a body scan search on July 13, 2021 or not – depending on if he was in a cast, had metal medical parts, or other health factors. ECF No. 49 at 83.

CCO Hutson testified that every single officer responsible for the intake process is trained on the proper way to search an inmate and their possessions, and while the documentation is not perfect, CCO Hutson has confidence that Defendant Jack Gibbins' property was searched was he was admitted into NCRJ on July 13, 2021. ECF No. 49 at 88-89. CCO Hutson testified that, to the best of his knowledge, Jack Gibbins has never lodged a complaint that his items seized by the jail on July 13, 2021 were not returned to him upon his release. ECF No. 49 at 90.

On recall, CCO Hutson testified that, generally, "hospital garb" is disposed of upon intake at North Central Regional Jail ("NCRJ") and not inventoried because it is not "actually their possession that they would have had when they got arrested." ECF No. 49 at 110-111. CCO Hutson testified that NCRJ has clothes, which have been donated by local churches and are available to give individuals upon release. CCO Hutson testified NCRJ provides clothing upon release from the facility for individuals who were admitted in hospital garb or without other clothing items, such as without a shirt or without pants. ECF No. 49 at 111-112. CCO Hutson testified, on cross-examination, however, that he cannot personally be sure if this was the case with Defendant Gibbins. ECF No. 49 at 112-113. CCO Hutson testified that when he read "pants (cut)" on Gibbins' July 13, 2021 inventory list, he would read that to mean Gibbins' personal pants, not any hospital-provided clothing. ECF No. 49 at 113.

### (6) Testimony of Joseph McCarty

The Government called Joseph McCarty ("McCarty"), Supervisory Deputy United States Marshal of the Northern District of West Virginia, Clarksburg Office, to testify. ECF No. 49 at 91.

18

McCarty testified that on July 23, 2021, he sent an email, admitted into evidence as Government's Exhibit E, ECF No. 44-6, which stated "Gibbins was arrested this afternoon by Clarksburg Police Department. Gibbins, under the supervision of USMS, is getting medical treatment for a broken leg that he sustained approximately a week ago during the incident mentioned in his SR violation petition.[7] Gibbins will be housed at NCRJ later this evening once he is released from the hospital. Gibbins will be available for a video IA from NCRJ on Monday. Thanks." ECF No. 49 at 93-94.

### (7) Testimony of Defendant Jack F. Gibbins, III

Counsel for the Defendant called the Defendant Jack F. Gibbins, III, ("Gibbins") to testify.[8] Gibbins testified that on July 13, 2021, he was arrested charged in Harrison County, West Virginia with fleeing from law enforcement. ECF No. 49 at 99. Gibbins testified that he wrecked or laid down his bike and began to move on foot "out of the road." *Id.* Gibbins testified he was bleeding "real bad" and was injured, including a broken leg, a deep laceration on his arm, two broken ribs, fractured C2 vertebra, and a shoulder separation. ECF No. 49 at 100, ¶ 1-4; at 102, ¶ 6-10.

Gibbins testified there were ten or more officers on scene to apprehend him. *Id.* at ¶ 5-7. He testified the officer who apprehended him, "grabbed" ahold of him, threw him down, and started assaulting him. *Id.* at ¶ 8-11; 16-19. He stated officers thought he was associated with the Pagans, due to his tattoos, and officers shouted, "He's a Pagan." *Id.* at ¶ 12-16. Gibbins further testified that the officers were screaming "check him for weapons, check him for drugs." *Id.* at ¶ 17-19.

Gibbins testified officers did a "very good search" of his person and "pull a lot of stuff out" of his pockets – including paper money and change, a lighter, some cigarettes, and a wallet. ECF

---

[7] *See United States v. Jack F. Gibbins*, III, Case No. 1:19-CR-5 (N.D.W. Va.).

[8] The Court, by the undersigned U.S. Magistrate Judge, advised the Defendant of his constitutional rights to remain silent, his right against self-incrimination, and his right to confer with counsel prior to his testimony. ECF No. 49 at 97-98.

No. 49 at 100, ¶ 20-25. Gibbins testified he was wearing a pair of jeans, sneakers, and a t-shirt. ECF No. 101. Gibbins testified that the items officers retrieved out of his pants were placed into a bag and placed in between his legs on the stretcher once he was placed in the ambulance. ECF No. 49 at 101-102 *see also* Defendant's Exhibit A, ECF No. 44-6. Gibbins testified that the ambulance transported him by himself to the hospital. ECF No .49 at 102, ¶ 11-14.

Gibbins testified that once at the hospital, hospital staff cut his clothing off, transferred him from the stretcher onto another stretcher and began treatment, including ultrasounds, obtaining x-rays of his leg, and stitching up lacerations. ECF No. 49 at 102, ¶ 15-21. Gibbins testified that he never saw his clothing items again after they were cut off his body. *Id*. at ¶ 22-24; ECF No. 49 at 106.

Gibbins testified that upon release from the hospital, his broken leg was placed in a splint or cast which went up above his knee. ECF No. 49 at 103, ¶ 2-6. Gibbins further testified that, because of his shoulder separation, he could not use the crutches provided and instead needed to use a wheelchair. *Id*. at ¶ 8-13. Gibbins explained that, to leave the hospital, officers "rolled" him out in a wheelchair to the "cop car." *Id*. at ¶ 12-14. Gibbins testified that he was wearing his own boxers, which had never been removed, and a pair of blue scrub pants, which had been provided by the hospital. ECF No. 49 at 104. Gibbins testified that upon release, he wore no shoes and no shirt. *Id*. Gibbins testified that the blue scrub pants had been cut to accommodate his splint/cast for his broken leg. *Id*. Gibbins testified that once they left the hospital, he and the officers went to the Bridgeport Police Department. ECF No. 49 at 103-105. Gibbins testified he wore the cut, blue scrub pants to both the police department and later to the jail. ECF No. 49 at 105.

Gibbins testified, on cross-examination, that when he was released on July 21, 2021, his wallet with contents, motorcycle helmet, crutches, belt, pair of shoes, the blue scrub pants, his

keys, a chain, a bracelet, his lighter, his pack of cigarettes, and his rings were returned to him. ECF No. 49 at 107-108.

### (8) Testimony of Jared Newman

The Government next called Jared Newman, Special Agent with the Bureau of Alcohol Tobacco, Firearms, and Explosives, ("SA Newman") to testify. SA Newman testified that on July 16, 2021, he conducted an audio-recorded, Mirandized interview of Defendant Gibbins at North Central Regional Jail. ECF No. 49 at 122. Five audio recording excerpts of the interview, relevant to the events of July 13, 2021, were submitted into evidence. *Id*. *See also* Government's Exhibit F.[9]

### A. Legal Principles

As a foundational matter, the undersigned notes the well-established principle that the Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "cardinal principle" is "that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

Generally, the Government bears the burden of establishing, by a preponderance of the evidence, that the facts and circumstances of a warrantless search bring the search within an exception to the warrant requirement. *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). *See also United States v. Davis*, 657 F. Supp. 2d 630, 636 (D. Md. 2009), *aff'd*, 690 F.3d 226 (4th Cir. 2012)

---

[9] *See supra* n. 4.

Also well-established is the exclusionary rule – a court should exclude evidence obtained by dint of law enforcement's unlawful arrest or search. *See Mapp v. Ohio*, 367 U.S. 643 (1961). However, a court should suppress evidence in a criminal matter "only … where its deterrence benefits of exclusion outweigh its substantial social costs." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (citations and quotations omitted).

### B. Analysis

The issues presented require the following analysis: (1) whether the search and seizure of Defendant Gibbins' pants at the hospital, post-arrest (which yielded the controlled substances for which he was indicted), violated Defendant Gibbins' Fourth Amendment rights; and (2) whether the discovery of the controlled substances by law enforcement was inevitable, particularly where both Bridgeport Police Department ("BPD") and West Virginia Department of Corrections and Rehabilitation ("WVDOCR") have written policies which require the search of arrestees.

I.   **Officer Thomas' search and seizure of the pants did not violate the Fourth Amendment because Defendant Jack F. Gibbins did not have an objectively reasonable expectation of privacy in the emergency treatment setting post-arrest and, further, Officer Thomas' actions were reasonable.**

To challenge a search, a defendant must first demonstrate that he had a reasonable expectation of privacy in the place that was searched. See *Rakas v. Illinois,* 439 U.S. 128 (1978); *see also United States v. Davis*, 657 F. Supp. 2d 630, 636 (D. Md. 2009), *aff'd,* 690 F.3d 226 (4th Cir. 2012), *cert. denied*, 571 U.S. 829 (2013).

Consequently, the first question presented is whether Defendant Gibbins had a reasonable expectation of privacy in his pants located on the counter of the emergency department treatment room in the hospital where he was brought following his arrest.

"Determining whether an expectation of privacy is 'legitimate' or 'reasonable' necessarily entails a balancing of interests." *Hudson v. Palmer*, 468 U.S. 517, 527-8 (1984)(no reasonable

expectation of privacy in prisoner's cell given the "paramount interest in institutional security"); *cf. King v. Rubenstein*, 825 F.3d 206, 215 (4th Cir. 2016).

This factual scenario has not squarely been addressed by this Court or by the United States Court of Appeals for the Fourth Circuit. However, the Fourth Circuit has held that individuals have diminished privacy rights following their arrest, and police officers may, with great freedom, conduct warrantless inventory searches of the personal property of individuals post-arrest without offending the Fourth Amendment. *United States v. Banks*, 482 F.3d 733, 741 (4th Cir. 2007). *See also Illinois v. Lafayette*, 462 U.S. 640, 642-648 (1983) (upholding standard procedure of seizing and searching "everything" in possession of an arrested person).

Furthermore, in *United States v. Davis*, 690 F.3d 226, 234 (4th Cir. 2012), *cert. denied*, 571 U.S. 829 (2013), the Fourth Circuit also held that police officers may lawfully access a hospital room to fulfill their duty of investigating a reported shooting, particularly where the individual they seek to engage is a suspected victim *even if that individual later becomes a murder suspect). *Cf. Washington v. Chrisman,* 455 U.S. 1, 8, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982) ("when a police officer, for unrelated but entirely legitimate reasons, obtains lawful access to an individual's area of privacy ...[,] the Fourth Amendment does not prohibit seizure of evidence of criminal conduct found in these circumstances."). In *Davis*, upon making lawful entry into the hospital room, it was "immediately apparent" or a "forgone conclusion" that the clothing contained within the personal belongings bag under the hospital bed had evidentiary value and was of an "incriminating nature." Davis, 690 F.3d at 237. Accordingly, the Fourth Circuit upheld the warrantless hospital search and seizure of Davis' clothing pursuant to the "plain view" exception. *Id.*

While neither binding on this Court, nor factually identical, sister circuits have made findings under similar circumstances which also inform the instant case. In *United States v. Mattox*,

27 F.4th 668, 673 (8th Cir. 2022), an officer entered the emergency treatment room of a man who had been shot, saw the man's clothes, and "at the officer's request, a nurse took . . . identification from the clothes." The man, based upon the seized identification and the video of his own shooting, was later convicted as a felon unlawfully in possession of a firearm. *Mattox*, 27 F.4th at 673 (8th Cir. 2022). The U.S. Court of Appeals for the Eighth Circuit noted, as salient facts in determining there was no reasonable expectation of privacy, that "police in Minnesota are expected to show up to hospitals to investigate a gunshot-wound victim like Mattox because Minnesota law requires hospitals to report gunshot wounds to the police" and that "in a hospital room, people are constantly coming and going from the room to provide medical services." *Id.* at 674. The Eighth Circuit ultimately held that the Defendant Mattox did not have an objectively reasonable expectation of privacy in his hospital room, and thus, the officer did not violate his Fourth Amendment rights by entering the room. *Id.*

In *United States v. George*, 987 F.2d 1428, 1432 (9th Cir. 1993), Defendant George argued he "had a reasonable expectation of privacy in his hospital room and that the police violated his rights by entering his hospital room and going through his bedpans themselves" for evidence of international drug smuggling. The U.S. Court of Appeal for the Ninth Circuit noted that Defendant George did not voluntarily admit himself to the hospital, but rather was admitted under police supervision following his arrest. *George*, 987 F.2d at 1432 (9th Cir. 1993). Furthermore, based upon the x-rays as well as the defendant's condition, the Court found probable cause that his stomach and any bedpan contents contained illegal narcotics. *Id.* The Ninth Circuit further provided "[u]nder these circumstances, it would be wholly unrealistic not to expect the police to place George under surveillance. In addition, the balloons . . . probably, contained contraband. They were subject to immediate confiscation." *George*, 987 F.2d at 1432 (9th Cir. 1993) (internal

citations and quotations omitted). *See also Chavis v. Wainwright*, 488 F.2d 1077, 1078 (5th Cir.1973) (clothing among hospital belongings properly seized from stabbing victim without warrant, despite victim telling officers he did not want to prosecute assailant-girlfriend).

Here, like in *George*, and not dissimilar to *Banks*, a key consideration is that Gibbins was in police custody at the time of the challenged search at the hospital. *See George*, 987 F.2d at 1432 (9th Cir. 1993); *cf. Banks*, 482 F.3d 733 (4th Cir. 2007) (upholding warrantless inventory search of arrestee's bag). Emergency medical services were called to the scene by law enforcement, and Gibbins was transported and admitted to the hospital at the direction of and with supervision by officers.

Notably, Gibbins was arrested and charged on that night with Fleeing in Vehicle With Reckless Disregard for the Safety of Others, under West Virginia Code § 61-5-17(f), ECF No. 44-7. Testimony of Officer Thomas, Officer Turner, and RN Tucker supports that the standard practice is that when someone is in police custody and poses a significant flight risk, officers closely supervise the individual either from inside the room, while the person receives treatment, or from chairs just outside the treatment room's glass doors. *See Transcript of Testimony of RN Tucker*, ECF No. 49 at 22-25 ("[W]ith him, with being under – in police custody, [officers] would be allowed to be in there. . . . Sometimes they just let themselves into the trauma room so that way they're right beside the patient in case they decide to act out. Sometimes they just sit outside the room. It just depends on their comfort level. . . . "would be pretty common for [officers] to be within the room[.]").

Furthermore, the testimony of Officer Thomas, RN Tucker, and Defendant Gibbins suggests, consistent with *Mattox*, supports that numerous healthcare personnel are required for critical treatment, such as what Gibbins required, and, in that setting, there is often a diminished

expectation of privacy. *See Mattox*, 27 F.4th at 673 (8th Cir. 2022). *See also Transcript of Testimony of Defendant Gibbins*, ECF No. 49 at 102, ¶ 15-21-24; ECF No. 49 at 106 (describing work by various personnel, including immediate removal of his clothing). Additionally, the healthcare professionals, RN Tucker and Director Backus, testified that it is the standard practice, particularly if an individual is under arrest, to inform law enforcement officers of any controlled substances discovered. *See Transcript of Testimony of RN Tucker*, ECF No. 49 at 19; Testimony of Director John Backus, ECF No. 49 at 28-29 ("[T]he general practice in the emergency department at UHC, United Hospital Center, is that if a nurse finds drugs in a patient's possession while they're under arrest but receiving treatment, they turn that over to the arresting law enforcement agency.").

"[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 573 U.S. 373, 381–82, (2014) (quoting *Brigham City v. Stuart,* 547 U.S. 398, 403 (2006). "A warrantless search only violates the Fourth Amendment when it is unreasonable." *United States v. Andrews*, No. 1:12CR100-1, 2014 WL 1663369, at *10 (N.D.W. Va. Apr. 23, 2014) (Keeley, J.) (citing *Davis*, 690 F.3d at 241). While there are distinct factual differences between the instant case and those outlined above, the undersigned **FINDS**, after considering the totality of the circumstances, that the seizure and subsequent search of Gibbins' pants was reasonable and not in violation of the Fourth Amendment.

It is uncontested that Gibbins was brought to the healthcare facility as an arrestee who, despite needing critical medical attention, was in police custody awaiting transport and intake at the regional jail. Considering Gibbins fled from officers earlier in the evening, including both a high-speed motorcycle chase and a foot chase, "it would be wholly unrealistic not to expect the police to place [Gibbins] under surveillance." *United States v. George*, 987 F.2d 1428, 1432 (9th

Cir. 1993). This includes monitoring Gibbins while healthcare professionals perform intimate medical procedures, standing by during nurses' invasive searches, and taking reports on arrestee Gibbins' health for investigatory and transportation purposes. An emergency treatment room, like a jail, "shares none of the attributes of privacy of a home" with "official surveillance" as "the order of the day." *Lanza v. State of N.Y.*, 370 U.S. 139 (1962).

Even if Gibbins had a subjective expectation of privacy in his hospital room, the undersigned **FINDS** that expectation was not objectively reasonable. *See Jones v. Murray*, 962 F.2d 302, 306 (4th Cir. 1992), *cert. denied.*, 506 U.S. 97 (1992)("[P]ersons lawfully arrested on probable cause and detained lose a right of privacy from routine searches of the cavities of their bodies and their jail cells[.]"); *United States v. Jeffus*, 22 F.3d 554, 559 (4th Cir. 1994) ("[I]mprisonment is the loss of freedom of movement, choice and privacy[.]").

Furthermore, it is uncontested that Officer Thomas was responsible for monitoring, inventory searching, and transporting Defendant Gibbins. Officers must not use lawful access, plain view, and inventory searches as a pretextual shield for "investigatory police motives," *S. Dakota v. Opperman*, 428 U.S. 364, 376 (1976), or as a means of intentional harassment, *Hudson v. Palmer*, 468 U.S. 517, 527 (1984). Simultaneously, it is "unreasonable to expect police officers in the everyday course of business to make fine and subtle distinctions in deciding which containers or items may be searched[.]" *Illinois v. Lafayette*, 462 U.S. 640, 648, 103 S. Ct. 2605, 2610, 77 L. Ed. 2d 65 (1983). Additionally, it is unreasonable to expect police "to act with the calm deliberation associated with the judicial process." *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963)

Like in *George*, and *Davis*, Officer Thomas had probable cause to believe that clothing found within plain view of the treatment room would contain controlled substances, based upon

the nurse's report to Officer Thomas about the discovery of drugs in Gibbins' pants pocket, in addition to his general knowledge about the police chase earlier in the night. *See George*, 987 F.2d at 1432 (9th Cir. 1993), and *United States v. Davis*, 690 F.3d 226, 236-8 (4th Cir. 2012) ("[T]he totality of the circumstances, taking into account [Officer] King's experience with the hospital's practices regarding patients' property, the appearance of the Defendant at the time [Officer] King spoke with him, and the obvious fact that the Defendant had been shot in an area of the body usually covered by clothing support the determination that it was a foregone conclusion the bag under Davis' hospital bed contained the clothing he wore when he was shot. . . . [T]he plain view doctrine justified both the warrantless seizure and the subsequent search of the bag containing the clothing under Davis' hospital bed.").

The totality of the circumstances here support, not only was there no reasonable expectation of privacy for Defendant Gibbins, but further, that Officer Thomas's warrantless seizure and subsequent search of the pants found on the counter was justified and reasonable, measured objectively, based upon his lawful access to the room, Gibbins' status as a post-arrest detainee, the pants' plain view position on the counter, and information Officer Thomas received from a nurse stating they had discovered drugs in Gibbins' pants' pockets. The undersigned therefore concludes by **RECOMMENDING** that Defendant Gibbins' Motion to Suppress, ECF No. 32, be **DENIED**.

> **II.   Regardless of Officer Thomas' actions, the preponderance of the evidence supports that the controlled substances would have been lawfully discovered upon routine inventory search prior to transportation or prior to entry into the regional jail.**

If this Court were to reject the recommendation above, finding instead that Defendant Gibbins had a reasonable expectation of privacy and that Officer Thomas's search was an unreasonable, warrantless search, the second question presented is whether the discovery of the

controlled substances by law enforcement was inevitable, particularly where both Bridgeport Police Department ("BPD") and West Virginia Department of Corrections and Rehabilitation ("WVDOCR") have written policies which require the search of arrestees.

In Nix v. Williams, 467 U.S. 431, 444 (1984), the Supreme Court held that, pursuant to the "inevitable discovery" doctrine, improperly seized evidence may nevertheless be admitted "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." The inevitable discovery doctrine only applies where evidence *would* have been lawfully discovered; mere speculation that evidence *could* have been discovered in insufficient. United States v. Alston, 941 F.3d  132, 138-140 (4th Cir. 2019). *See also* United States v. Allen, 159 F.3d 832, 840 (4th Cir. 1998) ("'A finding of inevitable discovery necessarily rests on facts that did not occur,' but 'by definition the occurrence of these facts must have been likely, indeed inevitable, absent the government's misconduct.'").

An inventory search is an "incidental administrative step following arrest and preceding incarceration conducted to protect the arrestee from theft of his possessions, the police from false accusations of theft, and to remove dangerous items from the arrestee prior to his jailing." United States v. Banks, 482 F.3d 733, 739 (4th Cir. 2007) (internal quotations omitted) (citing Illinois v. Lafayette, 462 U.S. 640, 644-46 (1983). The government may demonstrate standardized criteria "by reference to either written rules and regulations or testimony regarding standard practices." United States v. Clarke, 842 F.3d 288, 294 (4th Cir. 2009). However, "the government need not provide a written inventory policy to prove that a law enforcement agency conducts its inventory searches according to routine and standard procedures[.]" Bullette, 854 F.3d at 265 (4th Cir. 2017).

Here, the Bridgeport Police Department written policies and procedures, particularly Procedure 3.2.2. *et seq*., provides, "All detainees will be thoroughly searched for any weapons or

contraband prior to transport. The transporting officer should search the prisoner regardless of searches that may or may not have been conducted by arresting officers." *See Government's Exhibit H*, ECF No. 39-1 at 4; ECF No. 44-7 at 4. Testimony from Officer Thomas supports that he conducts these inventory searches, as required by policy, as a "habit" when interacting with anyone who is in custody – particularly, if he is responsible for transporting the individual to a regional jail. ECF No. 49 at 49, ¶ 10-21. While he could not recall what Gibbins was wearing or what personal property went with Gibbins to the regional jail, Officer Thomas testified that he performed a search on Mr. Gibbins for the purposes of transportation from the hospital to the regional jail. ECF No. 49 at 49, ¶ 22-23; ECF No. 49 at 56, ¶ 14-19.

The West Virginia Division of Corrections and Rehabilitation ("WVDOCR") Inmate Admission Procedures at Jails Policy III provides, "An officer of the same gender shall conduct a clothed body search checking for weapons and other obvious contraband before the removal of handcuffs. . . . After the pat searched [sic] is completed, the booking officer shall move the arrestee to the medical clearance assessment location with mechanical restraints still applied." ECF No. 39-2 at 5. Policy III.B. further provides, "All items found on or in the possession of the arrestee shall be confiscated, thoroughly searched and processed as follows." *Id.* Policy VI. provides that booking officers shall also "conduct the body scanner search of each inmate in accordance with policy." ECF No. 39-2 at 7. Additionally, pursuant to Policy IX.H., "[a]ll inmate property shall be searched, inventoried, and properly recorded on the Inmate Personal Property Inventory . . . prior to being placed in secure storage. The description of items shall be in sufficient enough detail for easy identification to include condition of the item." ECF No. 39-2 at 9.

An Inmate Personal Property Inventory Sheet related to Gibbins' July 13, 2021 intake was submitted into evidence and reviewed by CCO Hutson during his testimony. *See* Government's

Exhibit C, ECF No. 44-3. Personal property reflected on the sheet includes keys, a chain, a bracelet, four rings, a pair of pants (cut), a pair of shoes, a belt, a helmet, and crutches. *Id. See also* ECF No. 49 at 73-75; at 80. Chief Correctional Officer Hutson testified that while he was not personally there to oversee the inventory of Jack Gibbins at NCRJ following his July 13, 2021 arrest, ECF No. 49 at 81-2, CCO Hutson testified that when he read "pants (cut)" on the Gibbins' inventory list, he would read that to mean corrections officers searched, processed, and inventoried Gibbins' personal pants, not any hospital-provided clothing. ECF No. 49 at 113.

Defendant Gibbins stated in his testimony that he never saw his personal pants, or brown jeans, again after they were removed from his body at the hospital, ECF No. 49 at 106, ¶ 16-19, and that he wore a "pair of blue scrub" pants, provided by the hospital, to the Bridgeport Police Department and North Central Regional Jail.

The undersigned has reviewed the testimony and has determined that all of the witnesses present questions of credibility: CCO Hutson was not there on the day in question; Officer Thomas cannot recall most of the details regarding his transportation of Defendant Gibbins; Officer Turner could not recall what Gibbins was wearing at the Bridgeport Police Department; and Defendant Gibbins could not recall numerous details and made contradictory statements throughout the evidentiary record. Alas, "if men were angels, no [courts] would be necessary."[10]

Importantly, the Government's present burden is not the most exacting. "The burden of showing something by a preponderance of the evidence ... simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." *United States v. Manigan*, 592 F.3d 621, 631 (4th Cir. 2010) (quoting *Concrete Pipe & Prods. of Cal., Inc. v.*

---

[10] THE FEDERALIST NOS. 51-60 (James Madison).

*Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993) (internal quotation marks omitted).

The undersigned trier of fact **FINDS** it probable that Defendant Gibbins' pants, much like his wallet and chain, made their way from the scene to the hospital to the Bridgeport Police Department and finally to North Central Regional Jail. The undersigned further **FINDS**, more likely than not, and more often than not, both the Bridgeport Police Department and North Central Regional Jail adhere to their written policies as presented and as supported by the most credible portions of testimony, such that the discovery of the methamphetamine in Defendant Jack F. Gibbins, III's pants was inevitable.

To summarize, upon review of the written policies and procedures of BPD and WVDOCR, as well as all evidence and testimony provided, the undersigned trier of fact **FINDS** that the Government has carried its burden, by a preponderance of the evidence, of establishing both (1) that Defendant Gibbins' personal belongings, including his brown jeans, were transported alongside him and searched, as supported by the testimony of Officer Thomas, the testimony of CCO Hutson, and the Inmate Personal Property Inventory Sheet; and (2) that regardless of Officer Thomas' actions in the treatment room, the controlled substances in his brown pants would have been inevitably discovered either upon inventory search for transportation by BPD or upon inventory search as part of the intake procedures at NCRJ, a WVDOCR facility.

Accordingly, the undersigned **RECOMMENDS** that Defendant Gibbins' Motion to Suppress, ECF No. 32, be **DENIED**.

### IV. CONCLUSION

For the reasons set forth herein, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress, ECF No. 32, be **DENIED.**

Any party may, **within fourteen (14) days**, file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.**  A copy of such objections should also be submitted to the United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk of Court is **DIRECTED** to transmit copies of this Report and Recommendation to counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted March 2, 2023.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE