IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

      Plaintiff,

  v.                            CRIMINAL NO. 1:22-CR-59
                                    (KLEEH)

JACK GIBBINS,

      Defendant.

### MEMORANDUM OPINION AND ORDER
### DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 32]

On September 7, 2022, the grand jury returned a one-count indictment charging Defendant Jack Gibbins ("Defendant") with Possession with Intent to Distribute 5 Grams or More of Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii). Defendant has moved the Court to suppress certain evidence forming the basis of the charge [ECF No. 32].

The Court referred the motion to the Magistrate Judge for a Report and Recommendation ("R&R"). The parties briefed the motion, and the Magistrate Judge held hearings on February 7 and February 10, 2023. The Magistrate Judge entered an R&R on March 2, 2023, recommending that the motion be denied [ECF No. 56]. Defendant filed objections to the R&R, and the Government filed a response to the objections. For the reasons discussed herein, the Court adopts the R&R in part, rejects it in part, and **DENIES** the motion to suppress.

USA V. GIBBINS                                          1:22-CR-59

### MEMORANDUM OPINION AND ORDER
### DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 32]

## I.    FACTS

The Court finds the following facts based on the testimony and arguments at the suppression hearings, the parties' briefs, and the exhibits to both the hearings and briefs.

### The Motorcycle Pursuit

On July 13, 2021, Officer Cameron Turner ("Officer Turner") with the Bridgeport Police Department had been working afternoon shift, from 4:00 p.m. to midnight.  Transcript, ECF No. 49, at 33:1-3.  He was driving home from work when he observed a motorcycle at a red light.  Id. at 33:8-10.  The motorcycle then drove through the red light.  Id.  Officer Turner immediately initiated his emergency lights to conduct a traffic stop on the motorcycle.  Id. at 34:1-3.

After Officer Turner initiated his lights, the motorcycle did not stop.  Id. at 34:9-10.  Officer Turner then turned on his siren.  Id. at 34:10-11.  The motorcycle increased its speed in an attempt to flee, and Officer Turner called the pursuit in to Harrison County 911.  Id. at 34:11-16.  Harrison County law enforcement officers joined the pursuit.  Id. at 34:25-35:3.  As the motorcycle took the Anmoore exit, it almost struck a Harrison County cruiser, and the cruiser became the lead pursuer in the chase.  Id. at 35:7-9.

Eventually, the motorcycle wrecked, and Defendant, its

USA V. GIBBINS                                                    1:22-CR-59

### MEMORANDUM OPINION AND ORDER
### DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 32]

driver, fled on foot for 30-40 yards.  Id. at 35:11-12; 37:5-22;
128:10-15.  A K9 officer deployed a dog to pursue Defendant.  Id.
at 128:18-20.  Defendant was detained, placed in handcuffs, and
placed under arrest.  Id. at 35:17-18.  Law enforcement searched
Defendant's body, including his pockets, to ensure there were no
weapons on him.  Id. at 35:17-22; 38:14-25.  Defendant's
possessions were placed in a brown paper bag, along with his
motorcycle helmet.  Id. at 35:18-20.  The items included paper
money and change, a lighter, some cigarettes, and a wallet.  Id.
at 100:20-25.  Due to Defendant's injuries and the way he was
handcuffed, officers did not perform a full search incident to
arrest on the scene.  Id. at 41:17-42:9.

Defendant was injured during the encounter.  Id.  EMS arrived
on scene, evaluated Defendant, and took him straight to United
Hospital Center ("UHC" or the "hospital").  Id. at 36:3-4.
Defendant was wearing a pair of jeans, sneakers, and a tee shirt.
Id. at 101:6-7.  There was blood on him.  Id. at 102:5-6.  Officer
Turner does not recall Defendant's specific injuries.  Id. at
35:23-36:1.  He does not recall what Defendant was wearing when he
was loaded into the ambulance, but he recalls that there was blood
on him.  Id. at 39:15-21.

### Hospital Visit and Release

Officer Turner followed the ambulance to the hospital and

USA V. GIBBINS                                                    1:22-CR-59

## MEMORANDUM OPINION AND ORDER
### DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 32]

briefly monitored Defendant there, but he returned to the office
to begin paperwork related to the pursuit and arrest. Id. at
36:14-21. Officer Turner was relieved by Officer Isaac Thomas
("Officer Thomas") upon arrival at the hospital. Id.

Registered Nurse JoCee Tucker ("Nurse Tucker") treated
Defendant at the hospital. Id. at 13:21-22. Hospital staff cut
off Defendant's clothing, transferred him to another stretcher,
and began treatment, which included ultrasounds, x-rays of his
leg, and stitching of lacerations.[1] Id. at 102:15-21. Cutting
off clothing to evaluate and treat injuries is a normal occurrence
at UHC. Id. at 14:17-25. If a patient's clothing is cut off or
removed, hospital staff generally try to keep all of the patient's
belongings together, often by putting them in a belongings bag, so
that the patient may later decide if he wants to throw those
belongings away or wash them. Id. at 15:7-21. It is possible
that someone's cut-off clothing could be thrown away or left
behind. Id. at 15:22-16:2.

Officer Thomas's obligations were to stay with Defendant and
wait until he was medically cleared to be transported back to the

---

[1] Nurse Tucker does not recall cutting off Defendant's clothing.
Transcript, ECF No. 49, at 14:17-25. Because Nurse Tucker
testified that cutting off clothing is a normal occurrence, and
Defendant testified that his pants were cut off, the Court finds
that his pants were cut off.

USA V. GIBBINS                                                1:22-CR-59

**MEMORANDUM OPINION AND ORDER**
**DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 32]**

station.  Id. at 45:1-4.  When patients are brought to the
emergency room in police custody, as Defendant was, the officers
are permitted to be inside the trauma area.  Id. at 22:12-23:24.
Officer Thomas asked one of the nurses if she could smell alcohol
or drugs on Defendant, and she responded that she did not.  Id. at
52:23-53:3.  Nurse Tucker told Officer Thomas that she had seen
bags of suspected drugs in Defendant's pants.  Id. at 53:11-15.
Officer Thomas then went into the trauma room, where Defendant was
lying on the hospital bed.  Id. at 46:5-15; 54:2-4.  On a counter
to Officer Thomas's left, he saw all of Defendant's belongings,
including his pants.  Id. at 46:12-15.  Officer Thomas opened the
pocket of Defendant's pants and pulled out controlled substances,
including a substance ultimately determined to be methamphetamine.
Id. at 46:14-15; 53:16-23.

While there is no written policy, it is standard practice at
UHC that if a nurse finds drugs in a patient's clothing, the nurse
provides the controlled substance to law enforcement officers.
Id. at 28:6-29:6.  If Nurse Tucker were to find drugs in a patient's
clothing during a search, she would likely keep those drugs with
the patient's belongings and inform officers of the presence of
the drugs.  Id. at 19:10-17.  If Nurse Tucker found drugs in the
pants pocket of a patient who was under arrest, she typically would
not throw away the pants because they would be considered evidence.

USA V. GIBBINS                                                        1:22-CR-59

## MEMORANDUM OPINION AND ORDER
### DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 32]

Id. at 19:2-9.   Here, after Defendant was medically cleared,
Officer Thomas transported him to the Bridgeport Police Department
and gave the drugs to Officer Turner to place into evidence.   Id.
at 59:1-4.   Officer Thomas then transported Defendant to the
regional jail.   Id. at 59:17-20.

### Intake at NCRJ and Defendant's Pants

The parties disagree as to whether Defendant's personal pants
were transported to the Bridgeport Police Department and the
regional jail.   Defendant testified that he left the hospital
wearing his own boxers (which had never been removed), a pair of
blue scrub pants that had been provided by the hospital, no shoes,
and no shirt.   Id. at 104:8-17.   He testified that he never saw
his clothing items again after they were cut off of his body.   Id.
at 102:22-24.   He testified that he wore the scrub pants to the
police department and later to the jail.   Id. at 104:8-105:15.
Defendant testified that upon his release from the hospital, his
broken leg was placed in a splint or cast that went up above his
knee and that the scrub pants had been cut to accommodate it.   Id.
at 102:2-105:15.   Defendant also testified that because of his
shoulder separation, he could not use the crutches provided and
needed to use a wheelchair.   Id. at 103:7-13.

Officer Thomas, on the other hand, could not recall what
Defendant was wearing when he was released from the hospital.   Id.

6

USA V. GIBBINS                                                  1:22-CR-59

## MEMORANDUM OPINION AND ORDER
### DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 32]

at 55:22-56:5.  He could not recall whether Defendant's pants were
taken from the hospital and transported to Bridgeport Police
Department and the regional jail.  Id. at 47:11-12.  He could not
recall which of Defendant's personal items were taken to the
Bridgeport Police Department.  Id. at 46:16-20.  Officer Thomas
generally tries to take an arrestee's belongings with him to the
regional jail.  Id. at 47:1-6.  He could not remember the extent
of Defendant's injuries upon his release from the hospital, but he
remembered that Defendant had a large laceration on his leg.  Id.
at 54:18-23.  Officer Turner was present when Defendant arrived at
the Bridgeport Police Department, but he did not recall what
Defendant was wearing or what his injuries were at that time.  Id.
at 40:22-41:4.

The Bridgeport Police Department has a policy, 3.2.2, that
instructs officers to search arrestees before they are transported
to the regional jail, regardless of any prior search.  Id. at
47:20-24; Gov. Exh. A, ECF No. 44-1.  When Officer Thomas makes
initial contact with an individual in custody, it is his "habit"
to search him, particularly if Officer Thomas is responsible for
transporting him to a regional jail.  Transcript, ECF No. 49, at
49:10-21.  Officer Thomas believes that he did a search of
Defendant, in addition to the search of Defendant's pants, for the
purposes of transportation to the regional jail.  Id. at 49:22-

7

USA V. GIBBINS                                                    1:22-CR-59

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 32]

23; 56:14-19.

Officer Thomas is familiar with the intake procedures of North Central Regional Jail ("NCRJ" or the "regional jail") and the searches performed on arrestees who are processed into that facility. Id. at 49:24-5. Arrestees are placed into holding cells where they are instructed to place personal items, such as tobacco products or knives, into a drop box before undergoing a thorough search. Id. at 50:6-18. Next, all items found in the search and belongings provided to the jail by the arresting agency will be logged into NCRJ's system. Id. If any controlled substances are found during the intake process, they are returned to the arresting law enforcement agency so that law enforcement may take the contraband into evidence and pursue additional charges if desired. Id. at 50:19-51:4.

Jason Alan Hutson ("Hutson"), the Chief Correctional Officer at NCRJ with over 20 years of experience with the West Virginia Department of Corrections and Rehabilitation ("WVDOCR"), testified that it is his responsibility to supervise staff at NCRJ to ensure that they follow policies and procedures. Id. at 63:1-15. Hutson oversees the administration process and adherence to intake policies at NCRJ. Id.; Gov. Exh. B, ECF No. 44-2.

When a new intake is brought to NCRJ by local law enforcement, NCRJ staff performs a thorough pat search before the individual

USA V. GIBBINS                                                    1:22-CR-59

### MEMORANDUM OPINION AND ORDER
### DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 32]

comes into any secured area of the facility.  Transcript, ECF No.
49, at 65:21-25.  The individual's personal possessions are also
searched for weapons, drugs, alcohol, cell phones, or other
contraband.  Id. at 66:4-10; 69:8-11.  Correctional officers create
a personal property inventory for each person and the items he or
she brings to the jail to ensure that, upon release, the person
leaves with the same possessions.  Id. at 66:6-22.  A body scanner
is used to search the individual.  Id. at 67:2-19.

     If any illicit items are found during a pat search, body scan,
or personal property search, the correctional officer should turn
the evidence over to the arresting law enforcement agency and
notify supervisors.  Id. at 70:9-15.  This occurs because the
individual is not technically in the custody of the WVDOCR until
after completion of the intake/admission process.  Id. at 70:19-
23.  Hutson does not know how often the policies and procedures
regarding completion of personal inventory sheets are followed,
but the jail periodically goes through an auditing process.  Id.
at 83:20-25; 84:1-4.  Hutson stated that the intake process and
searches during intake are some of the most important rules
governing inmates within the institution.  Id. at 87:17-20.

     An Inmate Personal Property Inventory Sheet was completed for
Defendant upon intake on July 13, 2021, and it appears to be signed
by Defendant upon his release on July 21, 2021.  Gov. Exh. C, ECF

USA V. GIBBINS                                                        1:22-CR-59

## MEMORANDUM OPINION AND ORDER
### DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 32]

No. 44-3.  Hutson testified that the personal property listed on
the sheet was returned to Defendant: wallet with contents, keys,
chain, bracelet, four rings, 13 coins, "pants (cut)," belt, a pair
of shoes, a helmet, and crutches.  Id.; Transcript, ECF No. 49, at
74:6-8.  Hutson testified that any coins in Defendant's possession,
below $30, would be taken and put towards Defendant's processing
fee.  Transcript, ECF No. 49, at 74:20-24.  No shirt was listed.
Hutson was not present when Defendant was processed on July 13,
2021.  Id. at 82:2-6.  He does not know who searched Defendant.
Id. at 82:16-17.  He is not sure whether Defendant qualified for
a body scan search.  Id. at 82:18-83:8.

Another Inmate Personal Property Inventory Sheet was
completed for Defendant without a date; however, Hutson
ascertained that the sheet was associated with July 23, 2021.  Gov.
Exh. D, ECF No. 44-4; Transcript, ECF No. 49, at 77:3-8.  This
inventory sheet included a wallet with contents, pants, a shoe, a
belt, "sock," and underwear.  Defendant appears to have signed
this inventory sheet at the top, upon intake, but he did not sign
upon his release because he was transferred to another facility.
Transcript, ECF No. 49, at 81:14-18.

Every officer responsible for the intake process is trained
on the proper way to search an inmate, and Hutson testified that
while the documentation is not perfect, he has confidence that

10

USA V. GIBBINS                                        1:22-CR-59

### MEMORANDUM OPINION AND ORDER
### DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 32]

Defendant's property was searched when he was admitted into NCRJ on July 13, 2021. Id. at 88:1-89:12. There is no evidence that Defendant ever lodged a complaint that his items seized by the jail on July 13, 2021, were not returned to him upon his release.

Generally, "hospital garb" is disposed of upon intake at NCRJ and is not inventoried because it is not actually the inmate's possession at the time of arrest. Id. at 110:1-111:19. NCRJ keeps clothing, donated by local churches, that is available to give inmates upon release. Id. at 112:3-6. NCRJ provides this clothing to inmates upon release if they were admitted in hospital garb or without other clothing items, such as without a shirt or without pants. Id. Hutson could not personally be sure if this was the case with Defendant. Id. at 112:14-16. When Hutson read "pants (cut)" on Defendant's inventory list, he believed it referred to Defendant's personal pants, not any hospital-provided clothing. Id. at 113:10-13. Defendant testified that when he was released on July 21, 2021, his wallet with contents, motorcycle helmet, crutches, belt, pair of shoes, blue scrub pants, keys, chain, bracelet, lighter, pack of cigarettes, and rings were returned to him. Id. at 107:3-108:23.

After reviewing all the evidence and testimony, the Court finds that when Defendant left the hospital, he was wearing his personal boxers, blue hospital scrubs, no shoes, and no shirt, but

USA V. GIBBINS                                                    1:22-CR-59

### MEMORANDUM OPINION AND ORDER
### DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 32]

that Defendant's personal pants traveled with his belongings to the regional jail.  The Court makes these factual findings, in part, due to inconsistencies and falsities in Defendant's testimony.

Defendant is correct that no witness testified to seeing Defendant's personal pants at the regional jail.  Neither Officer Thomas nor Officer Turner could recall what Defendant was wearing when he left the hospital.  Officer Thomas could not recall whether Defendant's pants were transported with him or what other personal items were transported with him.  Officer Turner could not recall what Defendant was wearing when he arrived at the Bridgeport Police Department or the extent of his injuries at the time.  Conversely, Defendant recalled specific details about what he was wearing and what left the hospital with him.  He testified that he was wearing his boxers, cut blue hospital scrubs to accommodate his broken leg, no shoes, and no shirt.  He also testified about his leg splint/cast that went above his knee and his need for a wheelchair because he could not use crutches.

Although Defendant's recollection was more specific, the Court does not find it more believable.  Defendant made several false statements during his testimony.  For instance, Defendant testified that he "wasn't really trying to flee" from law enforcement and was "just trying to get out of the road."

12

USA V. GIBBINS                                                    1:22-CR-59

## MEMORANDUM OPINION AND ORDER
### DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 32]

Transcript, ECF No. 49, at 99:6-22.  In reality, Defendant ran 30-
40 yards after wrecking his motorcycle, which would have been
wholly unnecessary if he were simply trying to get off the road.
Defendant also testified that officers assaulted him and yelled
that he was a Pagan.  Id. at 100:8-19.  A review of the video
evidence introduced by the Government does not support this claim.
In addition, Defendant told law enforcement that he was working
for the Drug Task Force at the time of his arrest.  Had Defendant
been working with the task force, however, he would have had no
reason to flee from law enforcement.

While Hutson could not be certain that inventory procedures
were followed in Defendant's case, and he was not present when
Defendant was booked at NCRJ, his testimony indicated that NCRJ
never inventories "hospital garb."  Considered with Defendant's
false testimony outlined above, the Court finds Hutson's testimony
more likely to be true.  Because the regional jail does not
inventory hospital garb, the "pants (cut)" on Defendant's
inventory sheet likely referred to Defendant's personal pants.

In addition, Nurse Tucker testified that if someone's
clothing is cut off or removed, hospital staff try to keep all the
patient's belongings together, often by putting them in a
belongings bag, so that the patient may later decide if he wants
to throw those belongings away or wash them.  She acknowledged the

USA V. GIBBINS                                                    1:22-CR-59

**MEMORANDUM OPINION AND ORDER**
**DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 32]**

possibility that a patient's personal clothing could be thrown away or left behind, but because this only happens "sometimes," the Court finds it more likely than not that hospital staff kept Defendant's personal pants with his belongings and did not dispose of them. Nurse Tucker also testified that she would not throw away an arrestee's pants that had contained drugs. For these reasons, the Court finds it more likely than not that Defendant's personal pants traveled to the regional jail.

## II.   <u>THE PARTIES' ARGUMENTS</u>

In his motion to suppress, Defendant argues that he had a reasonable expectation of privacy in his clothing while in the hospital and that the search of his pants was unconstitutional. In response, the Government argues that the Fourth Amendment does not apply to private citizens (i.e. the hospital nurse) and that regardless of the search's constitutionality, the drugs would have inevitably been discovered.

After the hearing, the parties filed supplemental briefs. The Government argues in its supplemental brief that the drugs were subject to immediate confiscation because Defendant was in police custody while in the hospital.[2]   The Government also

---

[2] The testimony elicited at the suppression hearing made it clear that Officer Thomas, not Nurse Tucker, removed the drugs from Defendant's pants.

USA V. GIBBINS                                                    1:22-CR-59

### MEMORANDUM OPINION AND ORDER
### DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 32]

supplemented the record with additional electronic exhibits, which contain body camera recordings from six officers.  In Defendant's supplemental response, he argues again that he had a reasonable expectation of privacy in his pants at the hospital because he never abandoned them or consented to a search of them.  He argues that the search of his pants was not a search incident to arrest because the time and location were too far removed.  Finally, Defendant argues that the drugs would not have inevitably been discovered because the pants never arrived at the regional jail.

### III.  REPORT AND RECOMMENDATION

In the R&R, the Magistrate Judge recommends that the Court deny the motion to suppress because (1) the search and seizure of Defendant's pants did not violate Defendant's Fourth Amendment rights, and (2) even if it did, the controlled substances would have inevitably been discovered.

### IV.   OBJECTIONS AND RESPONSE

Defendant filed three objections to the R&R.  First, Defendant argues that the Magistrate Judge erred by finding the search to be lawful.  Defendant argues that the search of the pants was unlawful because he had a reasonable expectation of privacy in his pants, which required officers to obtain a warrant prior to searching the pants.  Second, Defendant argues that the Magistrate Judge erred by finding that the contraband would have inevitably been

USA V. GIBBINS                                                    1:22-CR-59

**MEMORANDUM OPINION AND ORDER**
**DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 32]**

discovered.  Defendant argues that the Government failed to show this by a preponderance of the evidence.  Specifically, Defendant finds troubling the Magistrate Judge's finding that Defendant's pants made their way to the regional jail, absent testimony from any witness stating that he or she saw the pants.  Third, Defendant argues that the Magistrate Judge erred by finding Defendant uncredible but failing to explain why.  Defendant asks the Court to review the credibility of each witness in detail.

In response, the Government argues that because Defendant's self-serving testimony is not credible, and because law enforcement would have inevitably discovered the drugs, the Court need not decide whether Defendant had a reasonable expectation of privacy in his hospital room post-arrest.

### V.   <u>DISCUSSION</u>

For the reasons discussed below, the Court rejects the Magistrate Judge's finding that the search of Defendant's pants was lawful, but it adopts the finding that the controlled substances would have inevitably been discovered.

### A.   **This Court will fully assess the credibility of each witness.**

Defendant argues that the Magistrate Judge failed to fully address the credibility of each witness.  He argues that the Magistrate Judge does not explain why he concluded that the

USA V. GIBBINS                                          1:22-CR-59

**MEMORANDUM OPINION AND ORDER**
**DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 32]**

officers were more credible than Defendant.  The Court has fully

assessed the witnesses' credibility in its findings of fact and

will continue to do so within the next two sections as it discusses

the substantive objections.

   **B.   Because no exception to the warrant requirement**
   **applied, the Court rejects the Magistrate Judge's**
   **finding that the search of Defendant's pants in the**
   **hospital was lawful.**

   Defendant objects to the Magistrate Judge's finding that

Defendant, who was post-arrest but not yet booked at the regional

jail, lacked a reasonable expectation of privacy in his pants while

at the hospital.

   The Fourth Amendment to the United States Constitution

provides,

          The right of the people to be secure in their
          persons, houses, papers, and effects, against
          unreasonable searches and seizures, shall not
          be violated, and no Warrants shall issue, but
          upon probable cause, supported by Oath or
          affirmation, and particularly describing the
          place to be searched, and the persons or
          things to be seized.

U.S. Const. amend. IV.  "[S]earches conducted outside the judicial

process, without prior approval by judge or magistrate, are per se

unreasonable under the Fourth Amendment — subject only to a few

specifically established and well-delineated exceptions.'"  Mincey

v. Arizona, 437 U.S. 385, 390 (1978) (citations omitted).  The

exceptions to the warrant requirement are "narrow" and "must be

USA V. GIBBINS                                               1:22-CR-59

### MEMORANDUM OPINION AND ORDER
### DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 32]

justified by specific circumstances." United States v. Davis, 997
F.3d 191, 202-03 (4th Cir. 2021) (citation omitted).

In United States v. Davis, law enforcement stopped a vehicle
being driven by Davis.  997 F.3d 191, 193 (4th Cir. 2021).  During
the traffic stop, while officers were speaking to one another,
Davis drove away.  Id. at 194.  The officers gave chase.  Id.
Davis exited his vehicle while carrying a backpack and ran on foot
into a swamp.  Id.  He returned to dry land, dropped his backpack,
and laid down on his stomach.  Id.  Officers handcuffed Davis and
placed him under arrest.  Id.  Afterwards, they unzipped his closed
backpack and discovered drugs and large amounts of cash.  Id.  The
court held that the warrantless search of Davis's backpack was
only permissible as a search incident to arrest if it was
reasonable for officers to believe that Davis "could have accessed
[the backpack] at the time of the search."  Id. at 198.  The court
considered whether Davis was "unsecured and within reaching
distance" of the backpack at the time of the search, and it found,
without question, that Davis was secured and was not within
reaching distance.  Id.  As such, the court found the search of
the backpack unlawful.

Here, like in Davis, Defendant was in police custody but had
not yet been transported to the jail.  Officer Thomas searched
Defendant's pants pockets without a warrant.  Thus, the Court

USA V. GIBBINS                                          1:22-CR-59

### MEMORANDUM OPINION AND ORDER
### DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 32]

analyzes which, if any, of the exceptions to the warrant requirement apply. Defendant did not consent to a search of his pants or abandon his pants. The controlled substances were not in plain view. The controlled substances were not discovered by plain feel via any protective pat-down. Officer Thomas was not conducting an inventory search. The circumstances were not exigent. Obviously, no exception relating to vehicles applies. The only arguable exception to the warrant requirement that would apply is a search incident to arrest.

A search incident to a lawful arrest is intended to "remove any weapons [the arrestee] might seek to use" and to "prevent the concealment or destruction of evidence." Arizona v. Gant, 556 U.S. 332, 339 (2009) (quotation marks and citations omitted). A search incident to arrest may extend not only to the person of the arrestee, but to any area "within his immediate control," meaning "the area from within which [the arrestee] might gain possession of a weapon or destructible evidence." United States v. Baker, 719 F.3d 313, 316 (4th Cir. 2013).

Like in Davis, Defendant was secured and not within reaching distance of his backpack. Defendant was undergoing medical care, and there was no risk that he would reach the pants to conceal evidence, destroy evidence, or remove potential weapons. As such, the search incident to arrest was not valid. No exception to the

USA V. GIBBINS                                          1:22-CR-59

### MEMORANDUM OPINION AND ORDER
### DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 32]

warrant requirement applied in this case.  For these reasons, the warrantless search of Defendant's pants in the hospital was in violation of his Fourth Amendment rights.[3]  On this issue, the R&R is rejected and Defendant's objection is sustained.

> **C.  Because Defendant's testimony is unreliable, the Court adopts the Magistrate Judge's finding that the controlled substances would have inevitably been discovered.**

Defendant objects to the Magistrate Judge's finding that the controlled substances would have inevitably been discovered upon a routine inventory search prior to, or upon, his entry in the regional jail.  Defendant takes issue with the Magistrate Judge's finding that the pants made their way to the regional jail, absent any witness's testimony that he or she recalled seeing the pants.

The inevitable-discovery doctrine "allows the government to use information obtained from an otherwise unreasonable search if it can establish by a preponderance of the evidence that law

---

[3] This conclusion does not, alone, indicate the evidence would be excluded at trial.  "Critically, in the Fourth Circuit, the flagrancy of police misconduct is a determinative factor in analyzing the propriety of applying the exclusionary rule." United States v. Jenkins, No. 1:22-CR-45, 2023 WL 3166161, at *6 (N.D.W. Va. Apr. 28, 2023).  Because the Court ultimately concludes the methamphetamine found in Defendant's pants would have been inevitably discovered at either the police department or regional jail and, therefore, not subject to exclusion from evidence, the Court will not undertake this necessary "good faith inquiry" to determine if the exclusionary rule should apply. Id. (quoting United States v. Stephens, 764 F.3d 327, 337 (4th Cir. 2014) (citation omitted)).

USA V. GIBBINS                                                    1:22-CR-59

### MEMORANDUM OPINION AND ORDER
### DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 32]

enforcement would have 'ultimately or inevitably' discovered the evidence by 'lawful means.'" <u>United States v. Bullette</u>, 854 F.3d 261, 265 (4th Cir. 2017) (citations omitted).  The prosecution must prove by a preponderance of the evidence that (1) the police legally could have uncovered the evidence, and (2) the police would have done so.  <u>United States v. Allen</u>, 159 F.3d 832, 840 (4th Cir. 1988).

The Court has already found that it is more likely than not that Defendant's personal pants were inventoried at the regional jail.  Given the undisputed evidence of the intake process at NCRJ, the Government has met its burden to prove, by a preponderance of the evidence, that the drugs in Defendant's personal pants pocket would have inevitably been discovered via a routine search at the police department or the regional jail.  Defendant does not suggest the routine searches at either the police department or regional jail are unreasonable or otherwise unconstitutional – in general or specifically here.  Instead, Defendant focuses on the factual dispute as to whether the pants ever made it to either location. The Court finds the Government has met its burden on this issue and finds Defendant's version of events uncredible.  Therefore, on this issue, the R&R is adopted and Defendant's objection is overruled.

USA V. GIBBINS                                                    1:22-CR-59

### MEMORANDUM OPINION AND ORDER
### DENYING DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 32]

### VI.   CONCLUSION

For the reasons discussed above, the R&R is **ADOPTED IN PART** and **REJECTED IN PART** [ECF No. 56]; the objections are **OVERRULED IN PART** and **SUSTAINED IN PART** [ECF No. 61]; and the motion to suppress is **DENIED** [ECF No. 32].

To the extent that beginning trial on June 5, 2023, may create a delay in Defendant's trial under the Speedy Trial Act, the Court **FINDS** that by beginning the trial on June 5, 2023, the ends of justice outweigh the interests of the defendant and the public in a speedy trial.  The Court specifically finds that after receiving this ruling on the motion to suppress, the parties will need until June 5, 2023, to prepare for trial.  Convening the trial before June 5 "would deny counsel for the defendant . . . the reasonable time necessary for effective preparation, taking into account the exercise of due diligence."  See 18 U.S.C. § 3161(h)(7)(B)(iv). Beginning the trial before June 5 would be likely to result in a miscarriage of justice.  See id. § 3161(h)(7)(B)(i).

It is so **ORDERED**.

The Clerk is **DIRECTED** to transmit copies of this Memorandum Opinion and Order to counsel of record.

DATED: May 26, 2023

_Tom S Kleeh_

THOMAS S. KLEEH, CHIEF JUDGE
NORTHERN DISTRICT OF WEST VIRGINIA